# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 16-76 |
| | ) Judge Nora Barry Fischer |
| ALBERT CLEMONS, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

I.  INTRODUCTION

This matter is before the Court on a motion to suppress evidence filed by Defendant Albert Clemons, ("Defendant"), and the Government's opposition thereto. (Docket Nos. 80, 89). The Court held a conference of counsel on July 31, 2017, (*see* Docket No. 95), at which time the parties declined to file additional briefing. After careful consideration of all of the parties' submissions, and for the following reasons, Defendant's Motion to Suppress [80] is denied.

II.  BACKGROUND

*A. Facts*

Defendant seeks to suppress incriminating statements that are included in the Application and Affidavit for a Criminal Complaint and Arrest Warrant ("the Affidavit"). (Docket No. 80 at 1-2; *see also* Docket No. 1-1). The Affidavit was completed by Conor M. Mullen on March 9, 2016, before Magistrate Judge Lisa Lupo Lenihan. (Docket No. 1-1 at 4). In the Affidavit, Mullen stated that he is a Detective Sergeant for the Allegheny County Sheriff's Office and a Task Force Officer ("TFO") in the Federal Bureau of Investigation ("FBI"). (Docket No. 1-1 at ¶ 1). In summarizing his work experience, Mullen averred that he has been employed by the Allegheny County Sheriff's Office for approximately seventeen years, and he has been assigned to the FBI, through which he investigates violent crimes, since 2008. (*Id.* at ¶ 2). Mullen

1

explained that he completed basic law enforcement training at the Allegheny County Police Academy; has received advanced training and is experienced in the investigation of violations of federal law; has been involved in arrests related to bank robbery and the execution of search warrants which resulted in the seizure of bank robbery evidence; and has used various investigative techniques, such as interviewing informants and cooperating witnesses, conducting physical surveillance and electronic surveillance, and preparing and executing search warrants which resulted in substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity. (*Id.* at ¶ 3).

In discussing probable cause, Mullen stated the following:

4. This application and affidavit are submitted in support of a criminal complaint against DOUGLAS SILVA and ALBERT CLEMONS. Based on my knowledge of the investigation as well as my discussion with other members of law enforcement, I have probable cause to believe that SILVA and CLEMONS committed armed bank robbery on March 2, 2016, in violation of Title 18, United States Code, Sections 2113(a) and 2113(d). This affidavit is being submitted for the limited and specific purpose of providing probable cause for the arrests of SILVA and CLEMONS for violations of Title 18, United States Code, Sections 2l13(a) and 2113(d). Your Affiant has not, therefore, included every fact known to him concerning the investigation.

5. On March 2, 2016, at approximately 2:50 p.m., the First National Bank located at 4808 McKnight Road in Pittsburgh, PA was robbed at gun point by two masked males. The bank employees reported that a white male and a black male entered the bank wearing masks over their faces. The employees were able to identify the individuals' races through the eye holes in the masks. The white male held the employees at gunpoint with a silver revolver from the lobby. The black male, armed with the semi-automatic handgun, went behind the counter and demanded money. He ordered the tellers, "Give me all the money. No die packs." He then removed the currency from three separate drawers. In doing so, he unknowingly took three $50.00 "bait bills" from the drawers.

6. The two males then fled the bank in a white Toyota sedan, headed northbound on McKnight Road. A witness (known to law enforcement but whose name is not included here for safety reasons) reported seeing two males wearing ski masks exiting the bank following the robbery. The witness called 9-1-1 as s/he followed the Toyota as it drove into and through the neighborhoods of Ross Township, and was able to provide identifying information about the car for law

enforcement follow-up. The Toyota ultimately made its way out of Ross and into Shaler Township. Shaler police units attempted to initiate a traffic stop on the vehicle, but the driver failed to stop and a pursuit was initiated.

7. The suspect vehicle eventually pulled over and stopped. The passenger fled on foot into the woods. The driver, later identified as DOUGLAS SILVA, was taken into custody without further incident. Officers from Ross and Shaler pursued the passenger, later identified as ALBERT CLEMONS, on foot. CLEMONS was ordered to the ground at gunpoint at which time Officers observed him drop a white canvas bag. CLEMONS was then taken into custody by Ross Officers.

8. The white canvas bag recovered near CLEMONS contained US Currency. In addition to the canvas bag, a purple shopping bag containing US Currency, and a white plastic trash bag with blue ties containing a black knit ski mask, a black hooded Slippery Rock sweatshirt, a PA license plate (JZA2369), and a pair of white surgical gloves were found near to where CLEMONS was taken into custody. CLEMONS was given his *Miranda* warnings at that location and was asked what he had done with the gun. He replied, "I dropped it in the woods." Two handguns were recovered near the site of CLEMONS' arrest: a silver .38 caliber Taurus revolver and a Hi-Point .380 caliber semi-automatic handgun. The Hi-Point was reported stolen by the Pennsylvania State Police in Uniontown in September of 2013. Notably, a review of the evidence taken from the scene revealed two of the three $50 bait bills were found with the cash recovered in the woods with CLEMONS.

9. SILVA and CLEMONS were transported to the Ross Police Department for questioning. SILVA was provided with his *Miranda* warnings by FBI Special Agent Michael Brokos and Ross Police Detective Michael Kirtley. Acknowledging that he understood his rights, SILVA admitted to being armed with the silver revolver and entering the bank with the purpose of robbing it. CLEMONS, interviewed separately, was also provided his *Miranda* warnings. During the interview, CLEMONS admitted to being armed with the semi-automatic handgun and entering the bank with the purpose of robbing it.

(*Id.* at ¶¶ 4-9).

B. *Relevant Procedure*

The Indictment in this matter was filed on April 6, 2016. (Docket No. 22). Defendant is charged at Count One of the Indictment with bank robbery, in violation of 18 U.S.C. § 2113(a), on or about March 2, 2016. (*Id.* at 1). At Count Two, Defendant is charged with armed bank robbery, in violation of 18 U.S.C. § 2113(d), on or about March 2, 2016. (*Id.* at 2). Defendant is

charged at Count Three with using, carrying, and brandishing a firearm and in relation to a crime of violence and possessing a firearm in furtherance thereof, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (ii), on or about March 2, 2016. (*Id.* at 3). At Count Five, Defendant is charged with felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), on or about March 2, 2016. (*Id.* at 5). The Indictment alleges that Defendant used firearms and ammunition to commit these violations, and the Government seeks forfeiture of the following property: (1) a Taurus, Model 85 Ultralite, .38 caliber revolver, bearing serial number VC79102, containing five rounds of ammunition; and (2) a HiPoint Model CF380, .380 caliber pistol, bearing serial number P8013527, containing eight rounds of ammunition. (*Id.* at 6).

Defendant filed the instant motion to suppress on May 31, 2017, (Docket No. 80), to which the Government filed a response in opposition on July 13, 2017, (Docket No. 89). This Court held a conference of counsel on July 31, 2017, (*see* Docket No. 95), at which time the parties declined to file additional briefing. As the matter has been fully briefed, it is now ripe for disposition.

III. DISCUSSION

*A. Evidentiary Hearing*

In his Motion to Suppress, Defendant requests an evidentiary hearing. (Docket No. 80 at 2). In response, the Government contends that a hearing is not warranted because Defendant has not raised a colorable claim. (Docket No. 89 at 8-9).

Following the filing of a motion to suppress by a defendant, it is within the Court's discretion to decide if an evidentiary hearing should be scheduled. FED. R. CRIM. P. 12(c). To require a suppression hearing, "a suppression motion must raise 'issues of fact material to the

4

resolution of the defendant's constitutional claim.'" *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010) (quoting *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996)). "In addition, the suppression motion must be 'sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress.'" *United States v. Stanton*, No. 11-CR-57, 2012 U.S. Dist. LEXIS 145932, at *7 (W.D. Pa. Oct. 10, 2012) (quoting *Hines*, 628 F.3d at 105). The burden of proof is on the defendant and is not shifted to the Government unless the defendant establishes a colorable basis for the claim. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

For the reasons that follow, the Court cannot conclude that Defendant has presented a colorable basis for his claim. Rather, the Court finds that "Defendant's failure to allege a factual dispute or wrongdoing on the part of the Government with any specificity is fatal to [his] request for an evidentiary hearing." *United States v. Brown*, No. 12-CR-367, 2013 U.S. Dist. LEXIS 143689, at *21-22 (E.D. Pa. Oct. 3, 2013) (determining that the defendant had "simply made bald accusations and assertions"). Thus, an evidentiary hearing is unwarranted in this matter.

   B. *Relevant Legal Principles*

Defendant has moved this Court to suppress the statements outlined above on the ground that they were taken in violation of his Fifth Amendment rights. (*See* Docket No. 80). On a motion to suppress, the controlling burden of proof imposes no greater burden than proof by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). Moreover, the Government, as the proponent of the evidence, must bear the burden of proving its admissibility. *See United States v. Coades*, 468 F.2d 1061, 1064 (3d Cir. 1972); *United States v. Colbert*, No. 89-CR-310, 1990 U.S. Dist. LEXIS 707, at *1 (D.N.J. Jan, 23, 1990) (citing *Kutz v.*

5

*United States*, 389 U.S. 347 (1968)).

The Fifth Amendment self-incrimination clause provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The Supreme Court has determined that a suspect must be given specific warnings of his Fifth Amendment rights prior to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *Miranda* specified these rights as follows: "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. The Court further explained that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Additionally, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). With these standards in mind, the Court turns to an analysis of Defendant's motion.

*C. Analysis*

Defendant argues that the incriminating statements that he made are inadmissible. The Court will address both of Defendant's statements, wherein Defendant first stated that he had dropped the gun in the woods and later admitted to being armed with the semi-automatic handgun and entering the bank with the purpose of robbing it, (*see* Docket No. 80 at 1-2; see also Docket No. 1-1 at 3-4), in turn.

1. <u>Defendant's Statement Regarding the Gun</u>

In his Affidavit, Mullen averred that after the suspect vehicle pulled over and stopped, the passenger, who was later identified as Defendant, fled on foot. (Docket No. 1-1 at ¶ 7). Officers pursued Defendant, ordered him to the ground at gunpoint, and then took him into custody. (*Id.*). After Defendant was given his *Miranda* warnings, he was asked what he had done with the gun. (*Id.* at ¶ 8). Defendant responded, "I dropped it in the woods." (*Id.*). Two handguns were recovered near the site of Defendant's arrest. (*Id.*). Defendant asserts that his statement was not knowing, intelligent, or voluntary because "same was made quite literally at gunpoint or as a direct result of being presented with or threatened by deadly force." (Docket No. 80 at 2). In response, the Government argues that Defendant's statement is admissible because Defendant waived his *Miranda* rights. (Docket No. 89 at 4).

To determine that a waiver was voluntary, knowing, and intelligent, two factors must be shown. First, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* In making this finding, courts examine the totality of the circumstances surrounding the questioning and the facts of the particular case, "including the background, experience, and conduct of the suspect." *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989); *see also Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991). Potential circumstances affecting the voluntariness of the statements include: (1) evidence of police coercion; (2) the length and location of the interrogation; (3) the defendant's maturity, physical condition, mental health and level of education; (4) whether *Miranda* warnings were

given; and (5) whether an attorney was present for the interview. *See United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994). A statement may be the product of police overreaching even after a defendant has been advised of and validly waived his *Miranda* rights. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) ("The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry."). However, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

Having considered the totality of the circumstances, the Court finds that Defendant's statement regarding the location of the firearm was voluntary. To this end, there appears to be no evidence of police coercion. While Defendant maintains that he made the statement "quite literally at gunpoint," (Docket No. 80 at 2), Mullen's Affidavit provides that Defendant was held at gunpoint only when he was ordered to the ground at gunpoint, (*see* Docket No. 1-1 at ¶ 7). After Defendant was taken into custody, he was given his *Miranda* warnings, and was then asked what he had done with the firearm. (*Id.* at ¶¶ 7-8). While the Court appreciates that Defendant may have been under emotional distress, the Court has not located, nor has Defendant provided, any authority suggesting that same is indicative of police coercion. *See, e.g.*, *United States v. Smith*, No. 07-CR-54, 2008 U.S. Dist. LEXIS 125216, *9 (N.D. Ga. Jan. 11, 2008) (where the defendant made an incriminating statement "while face-down on the ground with a gun pointed at him," the court noted the absence of "any authority holding that a suspect's statements are involuntary if they are made while the suspect is frightened" and found that "[w]hile Defendant may indeed have feared he was in danger, he was not forced to admit his possession of a weapon, nor was he prodded to admit as much"); *see also United States v. Elie*, 111 F.3d 1135, 1143-44

(4th Cir. 1997) (rejecting the defendant's argument that his statement concerning the location of the weapons was involuntary because it was "obtained immediately after he was arrested at gunpoint and placed in handcuffs" and noting that "we have previously held that neither the drawing of a gun by the interrogating officer nor the handcuffing of the confessor establishes involuntariness in and of itself") (internal quotations and alterations omitted); *United States v. Thrasher*, No. 91-30381, 1992 U.S. App. LEXIS 33844, at *5-6 (9th Cir. 1992) (where officers seized the defendant in the shower at gunpoint, affirming the denial of suppression because while "the atmosphere was no doubt tense and scary," the defendant made the incriminating statement after he was dressed, seated in the living room, and advised of his *Miranda* rights). Given these circumstances, coupled with the fact that Defendant was advised of his *Miranda* rights and has not raised any issues with respect to his maturity, physical condition, mental health, and level of education, the Court will deny Defendant's motion to suppress his statement regarding the location of the firearm.

2. <u>Defendant's Statement Regarding the Robbery</u>

In his Affidavit, Mullen stated that after Defendant was transported to the Ross Police Department, he was provided his *Miranda* warnings and interviewed. (Docket No. 1-1 at ¶ 9). During the interview, Defendant "admitted to being armed with the semi-automatic handgun and entering the bank with the purpose of robbing it." (*Id.*). Defendant again argues that his statement was not knowing, intelligent, or voluntary because he was "not properly advised of his right to remain silent" and because he was subject to "unlawful coercion by investigating officers." (Docket No. 80 at 1). In response, the Government argues that Defendant's statement is admissible because the interview occurred approximately seven hours after Defendant's arrest, at which time he was advised of his *Miranda* rights and voluntarily signed a form waiving same.

9

(Docket No. 89 at 5). This encounter was also videotaped. (*Id.*).

Given the totality of the circumstances, the Court finds that Defendant's statement regarding the robbery was voluntary. Specifically, Defendant offers no support for his conclusory assertion that he was subject to "unlawful coercion." (Docket No. 80 at 1). Defendant was interviewed seven hours after his arrest, and he voluntarily signed a form waiving his *Miranda* rights. As discussed above, Defendant has not raised any issues with respect to his maturity, physical condition, mental health, and level of education. Thus, in this Court's estimation, Defendant's statement "[was] completely voluntary and that there is unquestionably no record evidence to support a contrary conclusion." *United States v. Hayes*, No. 11-CR-69, 2012 U.S. Dist. LEXIS 170915, at *43-44 (W.D. Pa. Dec. 3, 2012) (denying motion to suppress where the defendant signed a *Miranda* waiver, "after which Defendant apparently offered his voluntary admission that seemingly was made without any prompting, manipulation or coercion"); *see also United States v. Barefoot*, No. 07-CR-405, 2008 U.S. Dist. LEXIS 59797, *35-36 (W.D. Pa. Aug. 5, 2008) (where the defendant signed a *Miranda* waiver, holding that his statements "were made knowingly, voluntarily, intelligently and without threat or coercion"); *United States v. Foster*, 287 F. Supp. 2d 527, 531 (D. Del. Oct. 21, 2003) (denying motion to suppress where the defendant signed a *Miranda* waiver and finding that the defendant's Fifth Amendment claim did not warrant a pre-trial hearing). Accordingly, the Court will deny Defendant's motion to suppress his statement regarding the robbery.

### D. Public Safety Exception

In the alternative, the Government asserts that even if Defendant had not voluntarily, knowingly, and intelligently made his statement regarding the gun's location, the same would be admissible under the public safety exception to *Miranda*. (Docket No. 89 at 6-8). Defendant has

not responded to the Government's argument and, as noted above, declined to submit additional briefing.

"While statements made by a defendant stemming from custodial interrogation are generally inadmissible at trial and presumed to have been compelled if the defendant was not previously advised of his *Miranda* rights, the Supreme Court . . . established a 'public safety exception' to *Miranda*." *United States v. Duncan*, 308 F. App'x 601, 605 (3d Cir. 2009) (citing and quoting *New York v. Quarles*, 467 U.S. 649, 655 (1984)). The public safety exception applies "when it would have been objectively reasonable for the officer to believe that asking the question was necessary to protect the public or police from immediate danger." *Id.*; *see also United States v. Stanton*, No. 11-CR-57, 2013 U.S. Dist. LEXIS 8983, at *14 (W.D. Pa. Jan. 22, 2013) (explaining that the public safety exception "permits questions that are necessary to protect either the public or police from eminent danger"). "The public safety exception requires examination of the totality of the circumstances." *Duncan*, 308 F. App'x at 606 (internal quotations omitted).

As an initial matter, the Court notes that an analysis of the public safety exception is unnecessary, as Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. Nonetheless, assuming arguendo that Defendant had not waived his *Miranda* rights, the Court finds that, given the totality of the circumstances, the public safety exception would apply to Defendant's statement regarding the gun. To this end, officers were aware that "a silver revolver" and a "semi-automatic handgun" were used during the robbery. (Docket No. 1-1 at ¶ 5). Following a pursuit by the officers, the suspect vehicle pulled over and stopped, at which point Defendant fled into the woods. (*Id.* at ¶¶ 6-7). After the officers pursued Defendant and ordered him to the ground, he dropped a white canvas bag. (*Id.* at ¶ 7). "In addition to the

canvas bag, a purple shopping bag containing US Currency, and a white plastic trash bag with blue ties containing a black knit ski mask, a black hooded Slippery Rock sweatshirt, a PA license plate (JZA2369), and a pair of white surgical gloves were found near to where [Defendant] was taken into custody." (*Id.* at ¶ 8). No firearms were recovered near the location where Defendant was taken into custody. (*See id.*). Here, "it was permissible for the police officers to question Defendant about the absence of the gun because they had a reasonable concern for their own safety . . . in the vicinity of where the gun was dropped." *United States v. Fisher*, 929 F. Supp. 26, 29 (D. Me. 1996). Accordingly, the Court finds that even if Defendant had not waived his *Miranda* rights, the public safety exception would apply to Defendant's statement regarding the location of the gun. *See, e.g.*, *also Fleming v. Collins*, 954 F.2d 1109, 1113 (5th Cir. 1992) (holding that following a bank robbery, holding that the officer's inquiry as to whether and where the defendant had dropped his gun "in order to prevent its falling into the wrong hands"); *United States v. Redmond*, No. 96-CV-40041, 1996 U.S. Dist. LEXIS 13049, at *9 (D. Kan. Aug. 15, 1996) (noting that "the burden on the police in *Quarles* likely would have been much less than that facing the officers here in searching for a gun in a wooded area").

IV. CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress [80] is DENIED. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Dated: August 8, 2017

cc/ecf: All counsel of record